Filed 4/13/23  In re Ai.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Ai.C., et al., Persons Coming Under the Juvenile Court Law. | B317600 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No 21LJJP00446) |
| Plaintiff and Respondent, | |
| v. | |
| DONALD C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Susan Ser, Judge.  Conditionally affirmed and remanded with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Donald C. (father) appeals from jurisdictional and dispositional orders regarding his daughters (Ai.C. and As.C.) under Welfare and Institutions Code section 300.[1] Father contends there was insufficient evidence to support the juvenile court's finding that his substance abuse issues placed Ai.C. and As.C. at a substantial risk of harm. Father further argues that the juvenile court erred in ordering a full drug and alcohol treatment program with aftercare, testing, and a 12-step program as part of father's dispositional case plan. Finally, father asserts the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry provisions of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.[2]

---

[1] All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] While we use the term "Indian" throughout this opinion to remain consistent with the statutory language of ICWA, "we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

On this record, we agree only with father's contentions with respect to ICWA inquiry error. Accordingly, we conditionally affirm the court's jurisdictional and dispositional orders and remand for further proceedings.

## BACKGROUND

The family consists of father, mother, their daughters As.C. (born November 2018)[3] and Ai.C. (born September 2017) (the children), and the children's maternal half-sibling A.H. (born May 2005).[4]

Since 2003, DCFS had received approximately 20 referrals related to mother, including several substantiated allegations for drug abuse, domestic violence, emotional abuse, and general neglect. In December 2017, DCFS received a referral alleging mother left Ai.C., A.H., and Zachary[5] in father's care despite there being a restraining order against father that protected mother, A.H., and Zachary from him. This referral was substantiated, but closed because the family already had an open court case. Father had no other referral history.[6]

---

[3]     As.C. was initially referred to as E.C. in the record.

[4]     A.H. and mother are not parties to this appeal.

[5]     Zachary is Ai.C.'s half-sibling and A.H.'s brother. He was 14 years old at the time of the December 2017 referral, but was 18 at the time of the referral leading to the instant petition, as to which he is not a party.

[6]     Mother had no known criminal history. Father's criminal history included the following convictions: petty theft and use/under the influence of a controlled substance in 2000, inflicting corporal injury to a spouse in 2008, transporting a

3

## I. Dependency referral and petition

The current matter came to DCFS's attention on August 7, 2021 based on a referral alleging mother relapsed into substance abuse. The caller reported that mother sent A.H. a photo of mother with a black eye. When A.H. asked mother what happened, mother stated: " '[t]hey tried to get in my head and I batted at them. They got mad and got my eye. That's the last time they will do that. They are dead now.' " According to the caller, mother sounded like she was hallucinating. Mother had gotten skinny and become paranoid. The caller also believed father was using drugs (but provided no details), and physically abusing mother in the children's presence.

On August 9, 2021, a social worker visited the family home with law enforcement. The children were in the front yard, one of them naked and the other in underwear only. The children, who were too young to provide a statement, appeared dirty but free of concerning marks or bruises. While the social worker was present, As.C. cut her foot on a sharp metal corner on the stairs and mother reported she was going to clean the injury.

---

controlled substance in 2011, possession of a controlled substance and burglary tools in 2012, getting credit using another person's identification in 2016, and possession of methamphetamine in 2020. Father's most recent arrest had been in June 2020 for possession of a controlled substance and drug paraphernalia, after father was pulled over and admitted that he had a small baggie of methamphetamine inside his wallet and a pipe underneath the driver's seat. The officer recovered those items and observed the pipe appeared to have been used to ingest methamphetamine.

Mother stated she was leaving father for reasons unrelated to domestic violence. According to mother, the parents only argued verbally and mother last used methamphetamine in June 2021. Father confirmed he was separating from mother due to his infidelity. Father stated that mother exclusively cared for the children. He claimed only to argue verbally with mother and that he last used methamphetamine a few months earlier. According to father, his drug use did not cause any issues. When asked about an injury to his nose, father insisted a lighter had exploded on his face, and that the injury did not relate to drug use.

On August 11, 2021, a social worker spoke with A.H. (16 years old at the time), who explained that she left to stay at her grandmother's house and did not want to return to the family home because it was not a good place to be. As recounted in the social worker's report, mother had accused A.H. "of being in a relationship" with father, which A.H. denied. Mother and father frequently argued, and would push each other. A.H. showed the social worker a picture of mother with a black eye. Mother said she was stung by a bee, but A.H. did not believe her. Mother informed A.H. she had relapsed and planned to go to rehab, but had not done so.

Because of that, A.H. was concerned for the children. They were not supervised, and had once climbed onto the roof of the family's trailer, and, in other instances, onto a net and a storage shed, all while mother and father were inside the family's home. Father got into a physical altercation with Zachary because he called father a druggie. A.H. was certain mother used drugs because her behavior changed. Mother was well for a long time, but father influenced her to engage in certain behaviors, starting with smoking cigarettes, then smoking marijuana, and then

5

using drugs. After mother and father discovered that A.H. had used a computer to seek help with relocating to a shelter, father told A.H. that if she spoke with a social worker and the children got taken away, father would " 'mess her up.' "

On August 13, 2021, mother told the social worker she had used marijuana a year or so ago and had previously used methamphetamine, but could not recall the last time she used it. She again denied domestic violence, but acknowledged she and father did not always get along.

On August 17, 2021, father refused to speak with the social worker without an attorney present. He said he no longer lived at the referral address and that the girls were out of state. Father refused to provide his new address or the location and contact information for the children. Father cursed at the social worker and argued with the social worker regarding the necessity of the investigation.

On August 25, 2021, A.H. again reported that the family home was unsafe and hostile, and had only become that way after father moved into the home. Although she saw no drug paraphernalia in the family home, she believed mother used drugs—including " 'that one you put in your arm' "—because mother was paranoid and mother became paranoid when she used drugs, and that father used drugs because he slept a lot. A.H. reiterated that mother and father would push each other during their arguments, that father threatened A.H. with violence if the children were taken away, and that father had slapped Zachary when he called father a druggie. A.H. remained concerned about the children's lack of supervision.

## II. Petition and detention hearing

On September 2, 2021, DCFS filed a section 300 petition on the children's behalf.[7] DCFS alleged the following: mother and father had a history of engaging in violent confrontations in front of the children, and the children's half-siblings were prior dependents of the juvenile court due to domestic violence between mother and the half-siblings' respective fathers (the a-1 count); mother endangered the children by allowing father to reside in the home (the b-1 and j-1 counts); mother had a history of substance abuse and was a current abuser of methamphetamine, and the children's half-siblings had been prior dependents of the juvenile court due to substance abuse by mother (the b-2 and j-2 counts); father had a history of substance abuse and was a current abuser of methamphetamine (the b-3 count); and mother had mental and emotional problems, including suicidal ideation, that endangered the children (the b-4 count).

DCFS subsequently filed a first amended petition correcting only the spelling of As.C.'s name. In conjunction with the amended petition, DCFS also requested that the juvenile court issue protective custody warrants as to the children, and arrest warrants as to mother and father, because the children's whereabouts were unknown to DCFS and the parents refused to provide information except to say the children were out of state.

At the detention hearing, which took place on September 7, 2021, the juvenile court made a prima facie finding of substantial risk of harm on the first amended petition and ordered the

---

[7] DCFS also filed the section 300 petition on behalf of A.H. Because she is not a party to this appeal, we omit any further discussion of what transpired in her dependency proceeding.

children detained at large. The court also issued the requested protective custody and arrest warrants, and ordered DCFS to walk the matter on the court's calendar when it ascertained the whereabouts of the children.

DCFS located the minors and placed them in protective custody on September 30, 2021. At an arraignment on October 4, 2021, mother appeared in court and denied the petition's allegations. The juvenile court found father was the children's alleged father, detained the children from parents, and temporarily placed them in foster care pending the next hearing. The juvenile court recalled the warrants previously issued, ordered DCFS to conduct a due diligence search for father, and set an October 26, 2021 arraignment date for him.

## III. Jurisdiction and disposition

### A. *The jurisdiction and disposition report and supplemental report*

The combined jurisdictional and dispositional hearing was scheduled for October 26, 2021. Prior to it, DCFS submitted two reports with updated interviews and information.

As outlined in the first report, a due diligence search for father proved unsuccessful and DCFS could not locate father. Father had not contacted DCFS or the caregiver to begin visits with the children. There were no known family law custody orders for the children. Additionally, DCFS made multiple attempts to interview mother, but mother did not respond to the text messages or voicemails left by the dependency investigator.

The dependency investigator interviewed A.H., non-relative extended family member Lisa B., and Ai.C. As.C. was too young to provide a statement. A.H. reported that, although father and mother had some good days, they fought a lot, yelling and calling

8

each other derogatory names. Sometimes father left the home due to the altercations. Once, mother tried to stop him, and A.H. saw father push mother out of the way. She had not seen other violent altercations or injuries on mother since mother's last boyfriend. Father cheated on mother " 'all the time.' " Father also belittled A.H. about her school work and said she would never amount to anything. A.H. also witnessed father slap her sibling Zachary in the face. A.H. was " 'pretty sure' " that father used drugs because he would come home " 'with really red eyes' " and " 'knock[ed] out.' " He would only drink alcohol with mother, which was "not often."

Lisa B. reported that father " 'beats the hell out of' " mother; mother had sent Lisa B. a photo of mother's " 'swollen and black and blue' " eye and included the following message: " 'He thought he got the best of me, but I killed him.' " Later, mother said she got stung by a bee. Mother had also told someone else that father punched her but Lisa could not recall the identity of that person. However, father didn't " 'normally' " punch mother. Lisa confirmed that, a few months ago, father struck Zachary in the face and said something like " 'well you're 18 now and you can't do a damn thing to me.' " The children were always really hungry and looked disheveled, unkempt, and dirty when they visited Lisa B. Father had a reputation as a " 'dope fiend' " and white supremacist. He used methamphetamine, marijuana, and alcohol. At Thanksgiving dinner in 2020, father appeared to be under the influence.

Ai.C. reported being happy with mother and father but sometimes felt afraid. She could not articulate why she was afraid and denied she was afraid of her parents. Ai.C. denied witnessing adults hitting, pushing, or hurting each other. She

9

stated that father " 'gets mad' " when she misbehaves, but was unable to provide further details. Mother yelled a lot, which A.H. found to be " 'scary.' " Mother would throw father's tools when angry with him. She spanked A.H. if she misbehaved and when she cried. Both father and mother drank beer and smoked cigarettes. Father also smoked " 'something else' " that looked " 'like water' " while inside the house.

DCFS reported the children had no known medical conditions and appeared to be meeting some developmental milestones. Neither child recognized numbers or knew their birthdates or the spellings of their names, but they had good motor skills. Ai.C. whined a lot, was at times defiant towards her caregiver, and wet her bed at night despite being potty trained.

As detailed in a supplemental report submitted in advance of the October 26, 2021 hearing, mother was interviewed, reporting that she and father never hit each other and she never sustained injuries. Mother stated, however, that on prior occasions father had pushed her out of the way when she tried to block him from leaving the home. A.H. had witnessed father push mother " 'but [A.H.] was always on her phone' " and the children were " 'probably' " present for that incident as well, but they were " 'doing their own thing.' " Father's " 'wandering eye' " was the cause of the parents' relationship issues. With respect to the swollen eye that had been raised as a concern in the August referral, mother explained that the swelling was caused by a bad reaction to a hornet or wasp bite, and not as a result of bruising. Mother would not confirm or deny whether father slapped Zachary, but confirmed father got upset when he called father a " 'drug addict' " and that there were "no bruises on Zachary" who was " '18 years old.' " When asked whether she had concerns

10

about the children's safety in father's care, mother stated: " 'If he's testing dirty, yes.' " Mother wanted to work together with father to regain custody of the children, but voiced doubts about whether father was willing to do what was necessary. She denied there were restraining orders between her and father.

B. *The jurisdiction/disposition hearing*

At father's October 26, 2021 arraignment, father did not appear but was arraigned on the petition through counsel. The juvenile court found father was the children's presumed father, continued the adjudication of the petition to November 12, 2021 so that father could be interviewed, and ordered that father receive a referral for weekly drug testing.

At the November 12, 2021 hearing, father appeared with counsel but had not yet been interviewed, prompting a further continuance of the hearing to December 2, 2021. As of December 2021, DCFS made several unsuccessful attempts to interview father regarding the allegations in the amended petition, and had no updates regarding his participation in any services. Nevertheless, father was in contact with DCFS and informed the agency that he had been travelling to different counties for work. Because of his work situation, DCFS had not yet been able to refer father to drug testing or arrange visitation.

At the December 2, 2021 jurisdictional and dispositional hearing, father appeared with counsel. The court accepted mother's no-contest plea and sustained counts as to mother's domestic violence, substance abuse, and mental and emotional problems, and the counts related to the abuse or neglect of the children's maternal half-siblings.

Father asked that all counts of the operative petition against him be dismissed. The children's counsel requested that

11

the court sustain several of the domestic violence and substance abuse counts related to father. Counsel pointed to evidence of domestic violence in the home and father's attempts to minimize it. This evidence included A.H.'s report of mutual pushing and shoving and mother's acknowledgement that the younger children were present. Father also slapped Zachary in A.H.'s presence, and threatened to retaliate against A.H. with violence if the children were removed from the home. Father admitted smoking methamphetamine as recently as a few months before his August interview. Father was also recently arrested for possession of methamphetamine and a methamphetamine pipe. Ai.C. also stated she saw father smoking cigarettes and something that looked like water. Counsel for DCFS raised similar contentions, adding that father had not been visiting with the children or testing.

The juvenile court amended the petition by interlineation to remove father from the a-1 domestic violence count, dismissed the j-2 count relating to mother's substance abuse, and sustained the following allegations as true. As to counts b-1 and j-1: "[Mother and father] have a history of engaging in violent altercations in the presence of the children. On prior occasions, the mother and . . . father pushed each other. The mother failed to protect the children by allowing . . . father to reside in the children's home and to have unlimited access to the children. . . . The children's siblings . . . are prior dependents of the Juvenile Court due to the mother engaging in violent altercations. . . . Such violent conduct on the part of the mother and . . . father and the mother's failure to protect the children, endangers the children's physical health and safety, and places the children at risk of serious physical harm, damage, danger and

12

failure to protect." And, as to count b-3: "[Father] has a history of substance abuse and is a current abuser of methamphetamine, which renders . . . father incapable of providing regular care of the children. The children, [Ai.C.] and [As.C.] are of such young ages as to require constant care and supervision. . . . Such substance abuse by . . . father, endangers the children's physical health and safety, and places the children at risk of serious physical harm, damage and danger."

In sustaining the allegations, the court reasoned that the children were very young (three and four years old) and that father's recent unaddressed history of substance abuse, including in Ai.C.'s presence, posed a current risk to the children.

The juvenile court heard arguments from the parties as to disposition. Father requested that the children be released to his custody, citing the lack of evidence that they were harmed, and further objected to the proposed requirement that he participate in a 52-week domestic violence program. The court declared the children dependents, removed them from parental custody, and placed them in foster care. It ordered reunification services for the parents, including monitored visits, and a case plan for father including: a full drug and alcohol program with aftercare, weekly drug and alcohol testing, a 12-step program with court card and sponsor, a 26-week domestic violence program (reduced from a 52-week program), parenting, individual counseling to address case issues including substance abuse and domestic violence, and conjoint counseling with mother if the parents remained a couple.

Father timely appealed.

IV.     **Facts relevant to ICWA**

As attachments to both the original dependency petition and the amended petition, DCFS submitted ICWA-010 forms for

13

the children indicating that it had not interviewed parents regarding their possible affiliation or membership in a federally recognized Indian tribe prior to the filing of each petition. On September 7, 2021, the juvenile court deferred ICWA determinations for the parents' appearances.

On October 4, 2021, at mother's first appearance, she submitted an ICWA-020 form, checking the box stating "[n]one of the above apply" concerning whether the children, mother, or any of mother's relatives are members of, or may be eligible for membership in, a federally recognized tribe, and signing the form. At a hearing that day, mother appeared with counsel and the juvenile court accepted mother's ICWA-020 form, and found no reason to know that ICWA applied as to mother. The minute order following the proceeding did not specify that mother must notify counsel, DCFS, or the juvenile court regarding any new information related to ICWA. Later that month, mother told the dependency investigator that father would suggest paternal uncle and his spouse as relative caregivers for the children.

In the first jurisdiction/disposition report, DCFS reported mother said she was born in Oklahoma and was the third of four children. She elaborated that she had two siblings in Texas with whom she did "not have much of a relationship," that maternal grandfather also lived in Texas (with whom she lived in 2013[8]), and that the maternal grandmother "struggled with drugs and alcohol all her life." Starting at age 4, she was raised in Lancaster, California. Her parents divorced that same year and

---

[8] Around this time, one of mother's daughters—then 20 months old—died of heatstroke when maternal grandfather left her in a car for eight hours in Texas.

14

she resided predominantly with maternal grandmother, with the parents sharing custody. She started using drugs at 14 years old, including marijuana and methamphetamine, and hard liquor at age 15. She was then on probation and became emancipated. Mother had never married but reported serious relationships with three men, all involving domestic violence and drug use.

The supplemental jurisdiction/disposition report reflected that, when DCFS interviewed mother in October 2021, she denied Native American ancestry. Mother stated that she met father in 2014 through a mutual friend. The supplemental report contained no information regarding father's possible affiliation with or membership in a federally recognized Indian tribe.

On October 26, 2021, at father's scheduled arraignment, an attorney "standing in" for father's "future attorney of record" appeared on behalf of father and denied the allegations. Father was not present. Stand-in counsel indicated that he had just spoken to father on the telephone that morning. The stand-in attorney submitted an ICWA-020 form to the juvenile court, checking the box stating "[n]one of the above apply" concerning whether the children, father, or any of father's relatives are members of, or may be eligible for membership in, a federally recognized tribe. The form was not signed by father. Rather, on the signature line was the following typed statement: "Signed via telephone by [counsel's name] on the above date." Stand-in counsel did not represent to the juvenile court that he spoke with father regarding possible tribal affiliation; nor did the juvenile court inquire. The juvenile court accepted the ICWA-020 form and found it had no reason to know that Ai.C. and As.C. were Indian children. The minute order following the proceeding did

15

not order father to keep his attorney, DCFS, or the juvenile court apprised of any new ICWA information.

At the subsequent November 12, 2021 and December 2, 2021 hearings attended by father, there was no mention of ICWA by the parties or the juvenile court.

## DISCUSSION

## I. Father's jurisdictional challenge is justiciable

Father contends that substantial evidence does not support the jurisdictional orders involving his substance abuse (§ 300, subd. (b)), as well as the resulting dispositional orders. DCFS counters that father's appeal should be dismissed as moot.

"[I]t is a court's duty to decide ' " 'actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " ' " (*In re N.S.* (2016) 245 Cal.App.4th 53, 58.) A case becomes moot, and subject to dismissal, when it is " ' "impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' . . . the plaintiff must complain of an ongoing harm [that is] . . . redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276.) This rule applies in dependency proceedings on a case-by-case basis, based upon whether the parent has demonstrated a specific and non-speculative legal or practical consequence to be avoided upon reversal of the jurisdictional orders. (*Ibid.*)

As a general matter, an appeal is often rendered moot "where jurisdictional findings have been made as to both parents but only one parent brings a challenge" or "where there are

16

multiple findings against one parent" and the parent declines to challenge the validity of one of the findings that is alone sufficient to sustain jurisdiction. (*In re D.P.*, *supra*, 14 Cal.5th at pp. 283–284.) Here, father does not dispute in his reply brief DCFS's contention that his appeal would ordinarily be mooted by mother's declining to appeal the jurisdictional orders related to her, and father's declining to challenge the domestic violence-related counts sustained as to him. That is because regardless of the outcome of this appeal, dependency jurisdiction over the children would remain intact.

However, father contends that the appeal is not moot because he is also challenging the dispositional order requiring him to engage in substance abuse treatment related programs. In other words, father argues even though dependency jurisdiction over the children will not be affected by the outcome of this appeal, the appeal is not moot because this court may still offer effective relief to father if we conclude the substance abuse count is not supported by substantial evidence. DCFS counters that because the dispositional order could stand as reasonable even absent the sustained count relating to father's substance abuse, there is no effective relief this court could grant as to the jurisdictional order.

Father is correct. "[A] case is not moot where a jurisdictional finding . . . 'has resulted in [dispositional] orders which continue to adversely affect' a parent." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 277–278.) Given that the underlying proceedings are ongoing, the dispositional orders that father complete a full drug and alcohol program with aftercare, weekly testing, and a 12-step program imposed by the juvenile court could readily—and adversely—affect father's rights. For

example, any noncompliance by father in these programs may well serve as justification for refusing to liberalize visitation, terminating reunification services, and denying future requests by father to return the children to his custody. Accordingly, if we were to find the dispositional orders related to substance abuse unnecessary as a result of an unsupported jurisdictional order, father would likely be granted effective relief, thus demonstrating his appeal is not moot. (*Id.* at p. 276.) While it is true that a reasonable dispositional order could stand absent a sustained jurisdictional count in some circumstances (for example when the juvenile court orders participation in parenting classes for a previously non-custodial non-offending parent), in this particular case, the challenged dispositional orders are directly related to the sustained substance abuse count. Thus, even though jurisdiction over the children remains intact regardless of this appeal, reversal of the substance abuse-related count would likely afford father effective relief. We therefore proceed to review the merits.

II.  **Substantive evidence supports the jurisdictional and dispositional orders based on father's substance abuse**

We review challenges to the sufficiency of the evidence underlying jurisdictional and dispositional orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) " 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.' " (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most

18

favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*I.J.*, at p. 773.) " ' " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " ' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.)

Section 300, subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . [or by] [t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." A finding of jurisdiction under section 300, subdivision (b)(1) requires the child welfare agency to prove three elements by a preponderance of the evidence: " '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) The juvenile court "may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384.)

Here, as we explain below, the statements of father and other witnesses as well as father's criminal substance abuse

19

history provide substantial evidence that father's substance abuse placed his young daughters Ai.C. and As.C. at substantial risk of serious harm, and that those risks had not abated by the time of the jurisdictional and dispositional orders.

Father had substance abuse-related convictions in 2000, 2011, 2012, and 2020. His 2020 conviction stemmed from allegations that, in June of that year, father was found with a baggie of methamphetamine and a methamphetamine pipe. When interviewed for this case in 2021, father admitted that he had used methamphetamine a few months prior to the filing of the petition (or approximately five months prior to the December 2021 jurisdictional/dispositional hearing).[9] He also explained that the burn injury to his nose occurred after a lighter exploded in his face.

Several witnesses corroborated the severity of father's substance abuse. A.H.—who father had threatened to harm if she spoke with the social worker and the children were taken away—believed father used drugs because he slept a lot and would come home " 'with really red eyes' " and "knock[ed] out." Further, A.H. attributed mother's relapse into drug abuse to father's influence. A.H. also witnessed father slap her brother Zachary after Zachary called father a "druggie." Lisa B. said that father was known to be a " 'dope fiend' " who used methamphetamine, marijuana, and alcohol, and that he had attended the previous year's Thanksgiving dinner under the

---

[9]     Though father suggests that this period was insufficiently recent to support a finding of current risk, he cites no authority for that proposition, and we are aware of no case applying such a rule to a parent with as prolonged and severe of a substance abuse history as father.

influence.  Ai.C. recounted that father drank beer, smoked cigarettes, and smoked " 'something else' " that looked " 'like water' " while inside the house.  Finally, when mother was asked whether she was concerned about the children's safety in father's care, mother stated: " 'If he's testing dirty, yes.' "

Longstanding and chronic substance abuse of this nature is a serious problem that generally cannot be ameliorated in a few months.  Even were that not the case, once this matter commenced, father not only did not enroll in a treatment program, but he largely declined contact with DCFS (including providing contact information for himself and the children.  When father was able to be interviewed, he was hostile toward the social worker and minimized his substance abuse despite also stating that he struggled with drug abuse "all his life." (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 [mother's failure to appreciate seriousness of substance abuse relevant to determination of whether she could modify behavior absent supervision].)  Father also did not participate in drug testing.  (Cf. *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004 [mother's substance abuse posed insufficient current risk where mother had tested clean for three months].)  Indeed, as of the December 2021 hearing, DCFS reported having no information regarding father's participation in services or his sobriety.

That As.C. and Ai.C. were three and four years old respectively at the time of the jurisdictional and dispositional hearing cannot be overlooked, either, given their heightened risk of harm due to their " 'tender years.' " (*In re Christopher R.* (2014), 225 Cal.App.4th 1210, 1216 [child of tender years faces an inherent risk of harm to his health and safety when not

21

adequately supervised].)[10]  The children regularly played outside naked and unsupervised while father was in the home.  While unsupervised, they engaged in potentially injurious behavior such as climbing on a net, on top of a storage shed, and on the roof of the family's home.  The children were always hungry and looked disheveled, unkempt, and dirty.  Further, the family home contained sufficient hazards to have caused one of the children to injure herself in the presence of the social worker.  (See *In re Natalie A.* (2015) 243 Cal.App.4th 178, 185 [parent's failure to fulfill obligations at home is "one of the most salient manifestations of parental substance abuse"].)  Under all of these circumstances, there was substantial evidence that father's substance abuse posed a sufficient current risk to the children.

Father's remaining arguments to the contrary are unavailing.  Father suggests that Lisa B.'s statements were not sufficient to support jurisdiction, given that Lisa B. could only speculate regarding father's current use of drugs.  As a court of review, however, we cannot reweigh the evidence or disturb the lower court's credibility determinations.  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)  Even so, there was other corroboration of father's substance abuse beyond Lisa B.'s statements, and no evidence suggesting the abuse had abated by the time of the hearing.

---

[10]  Troublingly, however, Ai.C. was sufficiently mature to recognize that father was smoking a water-like substance that was not a cigarette.  Father's continued assertion that Ai.C. did not make sufficiently clear that father was not smoking a vape pen is a veiled challenge to the juvenile court's credibility determinations, which we decline to entertain other than to say that Ai.C.'s age more than suffices to explain any lack of clarity in her statements.  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

In sum, there was ample record support to conclude that father's substance abuse was, and continued to be, sufficiently severe to place Ai.C. and As.C. at substantial risk of serious physical harm. Further, father had taken inadequate protective measures to sufficiently mitigate that risk. We therefore reject father's argument that the juvenile court's jurisdictional orders are not supported by substantial evidence.

Finally, as to disposition, father argues that the juvenile court's imposition of substance abuse-related services was an abuse of discretion because the juvenile court's jurisdictional orders related to his substance abuse are not supported by substantial evidence. As set forth above, there is more than substantial evidence to support the jurisdictional orders. Because father's only apparent quarrel with the dispositional orders is based on the alleged insufficiency of the evidence to support the jurisdictional orders, his challenge to the dispositional orders also fails. (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

## III. ICWA

### A. *Governing law*

Congress enacted ICWA to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement" (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32), and "to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881). (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578 (*Dezi C.*); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.)

23

Under California law, the juvenile court and the county welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a dependency petition "is or may be an Indian child." (§ 224.2, subd. (a).) "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (*Ibid*.) If a child is placed in the temporary custody of a county welfare department, the department "has a duty to inquire whether that child is an Indian child." (§ 224.2, subd. (b).) "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members[11], others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (*Ibid*.)

Additionally, at "the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" and "shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).)

---

[11] Section 224.1, subdivision (c), adopts the federal definition of extended family member: " '[E]xtended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

After the initial inquiry, if the juvenile court or the county welfare department "has reason to believe that an Indian child is involved in a proceeding," then the court or department "shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e).) If the court or the county welfare department "knows or has reason to know" that an Indian child is involved in a dependency proceeding, the county welfare department shall provide notice to relevant tribes and agencies for hearings that may culminate in an order for foster care placement, termination of parental rights, or adoptive placement. (§ 224.3, subd. (a).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

B.      *Standard of review and test for prejudicial error*

Courts generally review " ' "the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

In an appeal from an order terminating parental rights, a majority panel of this division articulated a hybrid substantial evidence/abuse of discretion standard of review with respect to

25

claims of ICWA inquiry error.  (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984 (*Ezequiel G.*).)  Under this standard, the appellate court reviews the juvenile court's determination as to whether there is reason to know a child is an Indian child for substantial evidence, and the ruling that DCFS exercised due diligence and conducted a proper and adequate ICWA inquiry for an abuse of discretion.  (*Id.* at pp. 1003–1004; see also *In re K.H.* (2022) 84 Cal.App.5th 566, 589 ["consistent with the reasoning in *In re Caden C.* (2021) 11 Cal.5th 614, 639–640, the determination that the agency's inquiry was proper, adequate, and duly diligent should be reviewed under a hybrid substantial evidence and abuse of discretion standard"].)

On the issue of prejudice, the appellate courts have crafted different standards for assessing when a defective ICWA inquiry is harmless.  These standards include: mandated reversal whenever an agency's inquiry is deficient (see, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 432–437); presumptive affirmance unless the appealing party can demonstrate with a proffer on appeal that further inquiry would lead to a different ICWA finding (see *In re A.C.* (2021) 65 Cal.App.5th 1060, 1065); reversal "where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child" (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744); and a harmless error analysis that considers whether "the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding."  (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779).  (See also *Ezequiel G.*, *supra*, 81

26

Cal.App.5th at p. 1014 [majority panel adopting harmless error standard articulated in *Dezi C.*].)

C. *The initial inquiry was inadequate and prejudicial*

Father contends there was insufficient evidence to support the juvenile court's ICWA finding because DCFS failed to conduct a proper and adequate inquiry regarding the children's possible tribal affiliation.[12] DCFS agrees that father's contentions are "well-taken" and that there is "little harm" in remanding for the purpose of conducting further inquiry. We concur.

In *Ezequiel G.*, the majority panel reasoned that in reviewing the juvenile court's ICWA finding that DCFS complied with its statutory duties, the "key inquiry should be whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding 'is or may be an Indian child' . . . . In other words, the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G., supra,* 81 Cal.App.5th at p. 1009.) While "inquiry of the parents will, in many cases, yield reliable information about a child's possible tribal affiliation," there may be occasions where "inquiry of extended family members will be necessary, either because parents do not appear in the dependency proceedings, refuse to answer ICWA inquiries, or

---

[12] We use the term "tribal affiliation" because "the test for whether ICWA applies does not turn on whether a child has 'Indian ancestry,' although that is often used as a shorthand reference for the subject of factual inquiries that may bear on the ultimate question whether a child is or may be an 'Indian child.' " (*In re Adrian L.* (2022) 86 Cal.App.5th 342, 351, fn. 11.)

give answers that are deemed unreliable by the juvenile court." (*Id*. at p. 1012.)

As we now explain, based on the record before us, the ICWA inquiry conducted as to father did not reliably answer the question of whether either child involved in this proceeding is or may be an Indian child.

First, the record discloses that DCFS never interviewed father regarding his or either child's possible tribal affiliation. To compound matters, DCFS also did not interview father regarding his upbringing or knowledge of his family ancestry, including whether he was raised by one, both, or neither of his biological parents, whether he spent his childhood primarily in or out of his family's care, and whether he had close or estranged familial ties. The absence of any information regarding father's possible tribal affiliation and familial ancestry bore directly on whether inquiry of extended family members was necessary to answer reliably the question of whether the children in this case are or may be Indian children.

Second, at the hearing in which the juvenile court concluded there was no reason to know Ai.C. and As.C. were Indian children, it did so based on an ICWA-020 form that was unreliable. Notably, the form was not signed by father. Rather, the form was signed by a stand-in attorney for father's assigned counsel. That same stand-in attorney represented to the court that he had only spoken to father over the telephone that morning. Stand-in counsel did not indicate whether he had discussed with father possible tribal affiliation, and the juvenile court inquired no further of the attorney when it received the ICWA-020 form and made the finding that there was no reason to know ICWA applied to these proceedings. Father was not

28

present when the juvenile court made this finding, and the record does not reflect that any of his family members were, either. Additionally, the minute order from that hearing does not indicate that father was ordered to notify counsel, DCFS, or the juvenile court about any updates regarding ICWA, including changes to the submitted ICWA-020 form. While any one of these individual factors may not necessarily on their own render a denial of tribal affiliation in an ICWA-020 form suspect, these factors, when present cumulatively as they are in this case, cast serious doubt on the reliability of the denial attributed to father. This lack of reliability only highlighted the need for DCFS to attempt to obtain additional information, namely by actually asking father about any possible tribal affiliation (whether on his part or either child's part), and by asking at least some available extended family members whether Ai.C. or As.C. is or may be an Indian child.

Third, the juvenile court did not raise the topic of possible tribal affiliation with father at the two hearings when father was present before the court, with his assigned counsel of record, and available to answer questions or lodge an objection to the court's prior ICWA finding made in his absence.

Given these specific circumstances and the bare record before the juvenile court with respect to father's possible tribal affiliation, under either a substantial evidence or abuse of discretion standard of review, we conclude the juvenile court erred by implicitly finding DCFS exercised the due diligence required by section 224.2 in its initial ICWA inquiry, sufficient for the court to determine ICWA did not apply. (See *In re K.H.*, *supra*, 84 Cal.App.5th at p. 589 ["On a well-developed record, the court has relatively broad discretion to determine whether the

29

agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes. When, as in this case, the court's implied finding that the agency's inquiry was proper, adequate, and duly diligent rests on a cursory record and a patently insufficient inquiry that is conceded, the only viable conclusion is that the finding is unsupported by substantial evidence and the court's conclusion to the contrary constitutes a clear abuse of discretion."].)

We further conclude that the inquiry error in this case was prejudicial under any standard of prejudice set forth in the preceding section, save for the presumptive affirmance standard, which we decline to follow.[13]

Under the mandated reversal standard, inquiry error "is in most circumstances, as here, prejudicial and reversible." (*In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 435.) As for the "readily obtainable standard," reversal is required "where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian

---

[13] We decline to adopt this approach for the same reasons articulated by the appellate court in *Dezi C.*, namely "by focusing on what a parent proffers on appeal," the presumptive affirmance approach "ignores that the juvenile court record may provide a reason to believe that the juvenile court's ICWA finding is incorrect and that further inquiry is warranted. Where, for instance, a parent is never asked about his or her American Indian heritage or the parent's answer is of less value because the parent is adopted, the presumptive affirmance rule would mandate affirmance in the absence of [a] proffer, even though, in our view, there is on those facts reason to believe the child may be an Indian child." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 785.)

child." (*In re Benjamin M., supra,* 70 Cal.App.5th at p. 744.) Here, there was indeed readily obtainable information from father himself about his possible tribal affiliation, which directly bore on whether his biological children are or may be Indian children. While we recognize that father did not make himself available for DCFS interviews regarding the dependency allegations, it appears he was in contact with the agency concerning visits with the children. During these communications, DCFS could have, but did not, inquire with father regarding possible tribal affiliation. Additionally, the record reflects that DCFS was in contact with mother, who had been in a relationship with father since 2014, and thus was another source of readily obtainable information regarding his ancestry.[14] Finally, under the harmless error standard articulated in *Dezi C., supra,* 79 Cal.App.5th 769, a reviewing court has reason to believe further inquiry might lead to a different result "if the record indicates that the agency never inquired into one of the two parents' heritage *at all*" (*id.* at p. 779, original italics), which is the situation presented here.

Because we conclude the ICWA inquiry error was prejudicial, we remand the matter for further proceedings.[15] On

[14]	Further, it appears from the record that DCFS may have had the contact information for the paternal uncle and his wife, who had been identified as possible relative caregivers by mother.

[15]	Because we are remanding the matter for further proceedings as to ICWA inquiry and notice (if applicable), we express no opinion as to the adequacy of DCFS's inquiry with respect to mother. As this case progresses, however, we note that the juvenile court and DCFS "have an affirmative and continuing

31

remand, the juvenile court shall order DCFS to comply with the inquiry provisions of section 224.2 as to father, and available maternal and paternal relatives.  Once the juvenile court has ensured that DCFS has complied with the requisite inquiry and, if applicable, any notice provisions of ICWA and related California law, the juvenile court shall determine whether ICWA applies to these proceedings.  If the court determines that ICWA does apply, then it shall conduct all further proceedings in compliance with ICWA and related California law.

---

duty to inquire whether" either child "is or may be an Indian child"  (§ 224.2, subd. (a)), that DCFS has a duty "on an ongoing basis" to report "a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status" (Cal. Rules of Court, rule 5.481(a)(5)), and that a juvenile court must reverse any finding that ICWA does not apply "if it subsequently receives information providing reason to believe that the child is an Indian child."  (§ 224.2, subd. (i)(2)).

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are conditionally affirmed. The matter is remanded to the juvenile court with directions as set forth in the opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

NGUYEN (KIM), J.*

We concur:

LAVIN, Acting P. J.

EGERTON, J.

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33